# UNITED DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| TONI T. PRIMM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV901 RWS/AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Toni Primm was not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or to Supplemental Security Income under Title XVI of the Act, §§ 1381-1383f. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for further proceedings.

Plaintiff, who was born on December 19, 1981, filed for disability benefits on August 15, 2005, at the age of 23, claiming a disability onset date of August 1, 1999, due to mental impairments including depression, suicidal tendencies, compulsive disorder, bipolar disorder, panic attacks, and anxiety. After her application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Such a hearing was held on May 15, 2006, at which point Plaintiff

amended her alleged onset date to February 15, 2005.  The ALJ found that Plaintiff had suffered from bouts of depression, but that the record failed to establish depression of a disabling severity for at least 12 continuous months.  The ALJ concluded that Plaintiff had the residual functioning capacity ("RFC") to perform a wide range of work, at least at the sedentary exertional level, with a limitation to simple tasks.  Relying upon the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2 ("Guidelines"), the ALJ found that Plaintiff was not disabled.  Plaintiff's request for a review by the Appeals Council of the Social Security Administration was denied on March 1, 2007.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ's determination that the only impact Plaintiff's mental impairments had upon her RFC was to limit her to simple tasks is not supported by medical evidence.  Plaintiff further argues that the ALJ erred in relying on the Guidelines and should have obtained the testimony of a vocational expert ("VE"). Plaintiff requests that the decision of the Commissioner be reversed, and that the case be remanded with directions to find that Plaintiff was disabled as of February 15, 2005.

## **Work History**

In November and December 1999, Plaintiff worked as a shipping loader, lifting and sorting boxes and packages up to 45 pounds onto trucks for five or six hours a day.  From June to December 2002, she worked on an assembly line, cleaning and organizing cans

and sorting newspapers, with light lifting. In April 2003, Plaintiff obtained full-time employment as a childcare provider, watching infants at a daycare center. Id. at 150-51. Plaintiff earned $538.11 in 1999, $2,737.55 in 2002, $7,665.54 in 2003, and $176.00 in 2004. Id. at 8. She stopped working in January 2004, when she had a baby. On her application for disability benefits she wrote, "I stopped working because I had my daughter and I had to breast feed her." Id. at 150.

**Medical Record**

The record indicates that, at the age of 19, Plaintiff was treated in an inpatient psychiatric hospital for depression and suicidal thoughts, from late December 1999 to early January 2000. Id. at 128, 154.

The record includes progress notes, from August through December 2003, written by medical personnel monitoring Plaintiff's first pregnancy. Notes from August 25, 2003, mention that Plaintiff had thought of slitting her wrists a week earlier. Risperdal[1] had been prescribed by her primary care physician one month earlier for depression and anger, but Plaintiff was not taking it. On October 14, Plaintiff denied depression. Notes from November 13 include the notation, "watch closely for postpartum depression." On December 5, Plaintiff denied depression and complained of "crabbiness." On December 11 and 23, the risk of postpartum depression was again noted. Id. at 245-57.

---

[1] Risperdal is an antipsychotic agent. Potential side effects include cognitive and motor impairment, and impaired judgment. Patients are advised not to breast feed while taking Risperdal. Physician's Desk Reference (2002 ed.) ("PDR") at 1798.

Plaintiff was admitted to the hospital to deliver her daughter on January 5, 2004. Admission notes mentioned Plaintiff's history of depression and anger. Id. at 225, 232, 235. On April 30, 2004, medical personnel at a gynecological clinic noted plans for follow-up with a psychiatrist and observed that Plaintiff "just feels down," without suicidal or homicidal ideation. Id. at 217.

On September 20, 2004, psychiatrist Aqeeb Ahmad, M.D., completed an initial patient evaluation and treatment plan. He wrote that Plaintiff complained of symptoms of depression for the past five to six months, starting during pregnancy. She reported that the father of her baby did not help, and that she had moved back to her mother's house. She also reported a family history of depression. Plaintiff expressed death wishes without suicidal intent, and feelings that people like her mother and father were against her. She denied hallucinations and homicidal thoughts. Dr. Ahmad observed that Plaintiff had a well-groomed appearance, normal speech, slowed motor skills, a depressed mood rating of 6 out of 10, dysphoria, anxiety, paranoia, logical/sequential thoughts, and fair judgment and insight. Using the multi-axial assessment system,[2] he diagnosed Axis I – major

---

[2]    The multi-axial assessment system involves assessing mental disorders on different axes, each of which refers to a different domain of information. There are five axes: Axis I refers to the individual's clinical disorders, other than personality disorders and mental retardation which are covered in Axis II; Axis III refers to the individual's general medical condition; Axis IV to psychosocial and environmental problems; and Axis V represents the clinician's Global Assessment of Functioning ("GAF").

A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to

(continued...)

depression with possible impulse control; Axis II – paranoid personality; Axis III – none, breast feeding; Axis IV – moderate; Axis V – GAF score of 51. Dr. Ahmad noted that Plaintiff was reluctant to take medication while breast feeding. Id. at 163-65.

Following a visit on February 15, 2005, (Plaintiff's amended alleged disability onset date), Dr. Ahmad noted that Plaintiff continued to feel depressed, expressed nervousness and fear of driving, had no hallucinations, and had death wishes without a plan. Dr. Ahmad reported other findings similar to those in his initial evaluation. He diagnosed major depression without psychosis, with an Axis IV – moderate and Axis V – 47. He prescribed Effexor,[3] Paxil,[4] Risperdal, and Elavil.[5] Id. at 162.

On April 4, 2005, Plaintiff complained to Dr. Ahmad of ongoing symptoms and discussed the loss of her grandfather to cancer in March. Dr. Ahmad reported a depressed mood rating of 6 out of 10 and Plaintiff's feelings that people were against her. He

---

[2](...continued)
physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" difficulties; scores of 51-60 indicate "moderate" difficulties; scores of 61-70 indicate "mild" difficulties.

[3] Effexor is used to treat depression. Potential side effects include anxiety, nervousness, and insomnia. PDR at 3495.

[4] Paxil is used to treat depression, obsessive compulsive disorder, panic disorder, and social anxiety. PDR at 1610.

[5] Elavil is used to treat depression, and can also be used to treat chronic pain. It is indicated for patients in whom depression and anxiety cannot be clearly differentiated. PDR at 3116.

diagnosed major depression with psychosis (noting a migraine headache), with an Axis IV – moderate, and a current GAF score of 50.[6] Id. at 161. The results of a CT of Plaintiff's head, performed on April 15, 2005, were normal. Id. at 209.

On April 19, 2005, Plaintiff had a headache, was not sleeping well, and reported that she cleaned her room a few times a day. Dr. Ahmad observed that Plaintiff had a well-groomed appearance, normal concentration, normal energy level, slowed motor response, a depressed mood rating of 5 out of 10, logical/sequential thought with poverty of content, no suicidality, no homicidality, and no hallucinations. He diagnosed obsessive compulsive disorder and major depression (noting another migraine headache). Dr. Ahmad prescribed Anafranil,[7] Paxil and Risperdal. Id. at 160.

On April 27, 2005, Plaintiff was hospitalized for inpatient psychiatric treatment under the supervision of Parimal Patel, M.D. Plaintiff reported trouble with insomnia and financial and job stressors, and complained that the father of her child was out of work and not paying child support. She stated that the reason for her hospitalization in 1999 for depression had been "because [she] had to watch [her] niece and nephew all the time." Intake examination notes state that Plaintiff was cooperative, with good eye contact; had a depressed mood with affect "restricted to lower range"; had goal directed flow of thought;

_____

[6]     Although the second digit in this numeral is difficult to read, the writing appears to be at least "50."

[7]     Anafranil is indicated for treatment of obsessions and compulsions.

felt helpless and worthless; used fair insight and judgment; and was actively seeking help. Id. at 172-73.

A Central Intake Assessment form documented thoughts of committing suicide by slitting her wrists or overdosing on medications, which had started the week prior to admission. Plaintiff complained of trouble falling asleep, waking up during the night, lack of appetite, and hearing voices that week. She maintained appropriate appearance and clear speech. The provisional diagnosis was Axis I – major depression, reoccurring; Axis II – deferred; Axis III – denies; Axis IV – social; Axis V – 30. Id. at 176-77. The final assessment at discharge on May 2, 2005, diagnosed Axis I – major depression, recurrent without psychosis; Axis II – none; Axis III – obesity, asthma; Axis IV – financial, occupational; and Axis V – 40. Plans for follow up with Dr. Ahmad on May 6, 2005, were made, and an intensive outpatient program was recommended. Id. at 170.

On May 5, 2005, Plaintiff visited an outpatient social worker for counseling. The diagnosis included dysthymia,[8] major depression (moderate, recurrent), and post traumatic stress disorder. Plaintiff did not return to the counseling center,[9] but began seeing

_____

[8] Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hyperinsomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Stedman's Medical Dictionary (28th ed.) at 602.

[9] By letter dated September 23, 2005, the counseling center explained to the state disability determinations agency that the center's services were recommended as outpatient care after Plaintiff's hospitalization, but that the center had "little information since [Plaintiff] did not return." Id. at 167.

7

psychiatrist Mohammed Kabir, M.D., in June 2005.  Dr. Kabir's treatment notes are

extremely difficult to read.  Notes from an intake history taken on June 8, 2005, include

notations that Plaintiff felt tired, had one friend, was too tired to go out, went to school for

a GED at 9:00 a.m., did not do drugs, saw her father twice a month, had experienced

abuse, and had limited insight and impaired judgment.  Dr. Kabir noted "depression . . .

because not working since last year," and financial difficulty.  Dr. Kabir's initial diagnosis

included Axis I – depression disorder not otherwise specified ("NOS"), history of alcohol

abuse; Axis II – personality disorder, avoidant personality; Axis III – none; Axis IV –

relational problems; and Axis V – 50.  Dr. Kabir noted that Plaintiff was taking Risperdal,

Klonopin,[10] and Anafranil.  Id. at 264-65.

At a well-woman exam on June 22, 2005, Plaintiff complained of depression.

Plaintiff was to follow-up with a psychiatrist/counselor and was advised to seek

emergency help should suicidal thoughts increase.  Her current medications for depression

were listed as Anafranil, Klonopin, and Desyrel (an antidepressant).   Id. at 205-07.

On June 29, 2005, Dr. Kabir reviewed the efficacy of Plaintiff's medications,

noting that Anafranil did not help her.  Id. at 262.  On July 15, 2005, Dr. Kabir wrote

Plaintiff "does not have much social life, has negative attitude, [is] getting her GED."  On

August 5, 2005, Plaintiff was sleepy from taking medication, was sleeping well, and was

---

[10]     Klonopin is indicated for the treatment of panic disorder.  PDR at 2983.

having difficulty concentrating. Id. at 263. On August 22, 2005, Plaintiff was feeling

down, had some suicidal ideation, and had had an argument with someone. Id.

When Plaintiff applied in person for disability benefits on August 31, 2005, a

Social Security Administration interviewer commented: "Claimant was dressed nice . . .

able to answer all the questions without any difficulty . . . did not show signs of physical

or mental limitations . . . appears to be capable and states being able to care for daughter

without any difficulty. . . . I do not see that capability is an issue . . . ." Id. at 147-48.

On September 8, 2005, Plaintiff's mother completed a third party function report.

She wrote that Plaintiff did not like to socialize much, had suffered from her illness since

age 17, and did not sleep well if medications were not taken. She reported that Plaintiff

needed reminders for medication. Plaintiff helped her with some housework, had some

fear of leaving the home alone, could not manage money well, could walk a mile before

needing rest, could pay attention for five minutes or less, got angry and agitated, and kept

saying that she was going to die soon or die young. Id. at 120-28.

In a function report completed on September 12, 2005, Plaintiff indicated that

depression affected her walking, standing, memory, concentration, understanding, and

ability to follow instructions and to get along with others. She stated that she had some

difficulty completing tasks like grocery shopping, personal care, caring for her child,

house and yard work, money, and focusing. Id. at 129-36.

On October 21, 2005, James W. Lane, Ph.D., a non-examining consultant,

completed a Psychiatric Review Technique Form based upon his review of the record. In

check-box format, he opined that Plaintiff had an affective disorder, a personality disorder, and a substance addiction disorder.[11]  Dr. Lane's functional limitations assessment indicated mild to moderate restrictions of daily living; moderate difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and one to two episodes of decompensation.  Dr. Lane found that Plaintiff's affective disorder did not meet the "C" criteria for this disorder.  In narrative form, Dr. Lane noted a lack of evidence of "specialty psych" treatment from 1999 until 2004.  He wrote that Plaintiff was, at worst, moderately impaired with medication.  He concluded that Plaintiff's

---

[11]    These disorders are listed in Appendix 1 of 20 C.F.R. part 404, Subpart P, as listings 12.04, 12.08, and 12.09, respectively.  An affective disorder (listing 12.04) is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met.  "A" criteria (medical findings) are met if there is a medically documented persistence of a depressive, manic, or bipolar syndrome.  "B" criteria (functional limitations) are met if there is a marked functional limitation in at least two of the following four categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.  "C" criteria  are met if the disorder has been of at least two years' duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate,  or (3) one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

A personality disorder (listing 12.08) is presumptively disabling if "A" criteria and "B" criteria are met, which together require deeply ingrained, maladaptive patterns of behavior resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.

Repeated episodes of decompensation "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. 404, Subpt. P, App. 1, 12.00 (C)(4).

respective diagnoses each did not meet or equal criteria "C" relevant to duration and episodic characteristics. Id. at 96-108.

Dr. Lane's Mental RFC Assessment, also completed on October 21, 2005, indicated no marked limitations in Plaintiff's capacity to sustain different activities over a normal workday and workweek on an ongoing basis. In check box form, he documented Plaintiff's moderate limitations in eight of 20 categories: (1) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) ability to work in coordination with or in proximity to others, without being distracted by them; (3) ability to complete a normal workday and workweek, without interruptions from psychologically based symptoms, and to perform at a consistent pace, without an unreasonable number and length of rest periods; (4) ability to interact appropriately with the general public; (5) ability to accept instructions and respond appropriately to criticism from supervisors; (6) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (7) ability to respond appropriately to changes in work setting; and (8) ability to set realistic goals or make plans independently of others. Id. at 110-11.

In narrative form, Dr. Lane opined as follows:

[Claimant's medically determinable impairments] cause moderately impaired social functioning and mildly to moderately impaired daily activity/adaptive functioning. [Claimant] should avoid work that involves significant public contact and/or teamwork and should avoid highly unstructured work. The seeming moderately impaired [concentration, persistence, and pace] ratings herein are solely due to the social nature of those criteria.

11

The [Claimant] retains the functional capacity to: interact adequately with peers, supervisors; understand, follow, and complete at least simple instructions; maintain adequate concentration, persistence, and pace with at least simple duties; and adapt adequately to routine work changes. There is no objective credible evidence the [Claimant] cannot complete at least simple repetitive work.

[Claimant] should maintain med compliance and must maintain reported [drug and alcohol] abstinence order to enhance vocational functioning.

[Claimant] would benefit from vocational rehabilitation.

Id. at 112.

Notes from Dr. Kabir on October 13, 2005, indicate that Plaintiff was "learning to manage her anger" and that she said Risperdal helped her. He prescribed Risperdal, Effexor, Klonopin, Anafranil, and Desyrel. Id. at 268. Notes from November 15, 2005, indicate that Plaintiff was having mood swings, depression, and mania. Dr. Kabir prescribed Depakote ER,[12] Effexor, Risperdal, Klonopin, Anafranil, and Desyrel. Id. at 269. Notes from November 30 and December 12, 2005, indicate that Plaintiff was angry and having a lot of anxiety. Dr. Kabir additionally prescribed Seroquel (an antipsychotic). Id. at 269-70.

On December 27, 2005, Plaintiff visited therapist Louise Cohen, LCSW. Ms. Cohen wrote about Plaintiff's experience of stress during the holidays, history of abuse,

---

[12] Depakote ER is indicated for treatment of bipolar disorder, epilepsy, and migraine headaches. PDR at 437.

difficulty with relationships, efforts toward a GED, and some signs of positive esteem and assertiveness.  Id. at 282.

On January 11, 2005, Ms. Cohen noted that Plaintiff's mood was stable, and that Plaintiff was working toward her GED, had a relationship with a new friend, and was avoiding another abusive friend from the past.  Id. at 281.  Notes from Dr. Kabir on January 13, 2006, stated "suggest do some work."  Id. at 270.  The results of a blood test on January 19, 2006, indicated a Depakote level of 27, lower than the therapeutic level of 50.  Id. at 273.  Ms. Cohen wrote on January 25, 2006, that a few things had "improved" for Plaintiff, including her relationship with her mother, and that Plaintiff was working on setting realistic expectations.  Id. at 280.  On February 6, 2006, Ms. Cohen noted that Plaintiff was feeling testing anxiety, that Plaintiff might get a part-time job, and that Plaintiff was "mostly depressed about not taking [the] GED."  Id. at 279.

Ms. Cohen wrote on February 20, 2006, that Plaintiff did not feel ready to take the GED exam, but that Plaintiff's teacher did feel she was ready and that Plaintiff and Ms. Cohen had discussed future plans.  Id. at 278.  Ms. Cohen wrote on March 14, 2006: "Patient's appearance has improved today" and that Plaintiff felt ready for her GED.  The session included a discussion about molestation in the past, and difficulty with Plaintiff's father.  Ms. Cohen documented that Plaintiff was compliant with medication, and positive about child care.  Id. at 277.

Notes from Dr. Kabir on March 17, 2006, indicated that Plaintiff felt tired all the time, could not stay asleep, and that her mood was still fluctuating.  He diagnosed a GAF

13

score of 52.  Id. at 271.  March 27, 2006 blood test results indicated a Depakote level of 37.  Id. at 274.  Ms. Cohen wrote on March 28, 2006, that Plaintiff was waiting for a date to take the GED, and that Plaintiff's relationship with her child was going well.  At that visit, Plaintiff and Ms. Cohen discussed how to communicate and compromise, and worked on "future goals" upon completion of Plaintiff's GED, including various alternate plans for a job and what Plaintiff would do if she had to take the test again.  Id. at 276.  Ms. Cohen wrote on April 18, 2006, that Plaintiff had improved her appearance with a new hair-do, but had not taken the GED.  Id. at 275.

On May 10, 2006, Dr. Kabir completed a medical source statement indicating in check box format that Plaintiff had marked difficulties in maintaining socially acceptable behavior and in performing at a consistent pace without an unreasonable number of rest periods.  Dr. Kabir noted that Plaintiff had moderate difficulties with her ability to cope with normal work stress; to behave in an emotionally stable manner; to maintain reliability; to relate in social situations; to interact with the general public; to accept instructions and respond to criticism; to maintain regular attendance and be punctual; to complete a normal workday and workweek without interruption from symptoms; to maintain concentration for extended periods; to respond to changes in work setting; and to work in coordination with others.  He noted only a mild limitation in Plaintiff's ability to function independently.  Id. at 285-86.

Dr. Kabir indicated that Plaintiff had had one or two episodes of decompensation in the past year.  In response to the question of whether limitations had lasted for a

14

continuous 12 months, or could be expected to, Dr. Kabir wrote "Can't assess. Patient has not been compliant with [treatment]." He diagnosed bipolar disorder, depression, avoidant personality disorder, and a GAF of 52 as of March 17, 2006, with a high GAF of 65 and a low of 50 in the past year. Dr. Kabir wrote that Plaintiff's "response to [treatment] has been compromised because of her noncompliance with medication. She needs to engage in treatment to consist of psychotherapy and pharmacotherapy." Id. at 286-87.

**Evidentiary Hearing of May 15, 2006**

At the evidentiary hearing, Plaintiff testified that she was 24 years old, and lived in her mother's house with her mother, nephew, and two-year old daughter. Her highest education level was the tenth grade, and she had been in remedial reading classes while in school. At the time of the hearing, Plaintiff received $234.00 in Temporary Assistance for Needy Families, and $278.00 in food stamps monthly, and paid $150.00 in monthly rent to her mother. Id. at 295-97.

Plaintiff testified that her last job, starting in April 2003, was a full-time position at a childcare center, working with infants. She testified that she stopped working in January 2004, because of depression, suicidal thoughts, crying spells at work, and not being able "to put up with the babies crying." Plaintiff had not worked since then. Id. at 297.

When asked to describe any work in the past 15 years, Plaintiff testified that she had worked for three weeks as a loader in 1999 for a shipping company, and stopped because of asthma. The ALJ noted that the application did not include anything about

asthma, and Plaintiff's attorney clarified that Plaintiff's asthma was currently fairly well controlled, and that the "main problem was depression." Id. at 298.

Plaintiff testified that she had not worked in another job for longer than a week, but then recalled working for a temporary service for nine months on an assembly line in 2002. At that job, she cleaned off containers and stacked newspapers. Plaintiff stopped working on the assembly line because she found the job at the childcare center. When asked what had been the main factor keeping her from working full-time currently, Plaintiff responded "headaches which the doctor says comes from the depression. The suicidal thoughts, me getting angry, crying, just tired." Id. at 299.

Plaintiff's attorney directed the ALJ's attention to Dr. Ahmad's February 15, 2005 report in which Dr. Ahmad assigned Plaintiff a GAF score of 47 and wrote that Plaintiff was "depressed, anxious, irritated with positive death wishes." Plaintiff's counsel noted that Dr. Ahmad had been treating Plaintiff since September 2004. Id. at 300-02.

After attempts to decipher various illegible medical reports in the record, Plaintiff's attorney returned to questioning Plaintiff about her symptoms when she stopped working at the childcare center in January 2004. Plaintiff testified that, at that time, her crying spells were affecting her two to three times a day. She testified that in the month prior to the hearing, she had experienced a crying spell once a week. Directly after the April 2005 hospitalization, Plaintiff had crying spells "maybe once a week." Id. at 307-08.

Plaintiff testified that when she started seeing Dr. Kabir, she had been feeling angry and that everyone was against her. She testified that she became aggravated when people attempted to engage in conversation with her, but did not feel the same way in places such as a grocery store, where one could remain more isolated. Plaintiff testified that these symptoms persisted. She did not think that medications prescribed by Dr. Kabir were helping "like they should." Plaintiff testified that she took her prescribed medications as she was "supposed to." She said the drugs caused dizziness, nausea, and hand shakes, and had been changed nearly monthly. Id. at 308-09.

Plaintiff testified that she felt "real nervous and anxious," "jumpy," and unable to sit still. She described that her "hands get to shaking really bad." She stated that nothing in particular brought on anxiety, and that she had not felt like that before 2005. She stated that she experienced such symptoms the week before being hospitalized in April 2005, and that the hospitalization helped her symptoms subside. Id. at 310-11.

Plaintiff testified to having sleep problems since August 2005. She sometimes could not fall asleep. She sometimes woke up three to four times during the night, for no reason in particular, without being able to fall back to sleep. She also found it hard to concentrate and remember things. She recalled feeling that way when she decided to stop working at the childcare center, and testified that her ability to concentrate had worsened since then. She described having to read a magazine over and over, and having difficulty recalling something she had just read. Plaintiff stated that she could complete general paperwork for her daughter. She also stated that she could bathe her daughter, but that it

17

took a long time, that she did not know why, and that she needed her mother's help.  Id. at 311-13.

Plaintiff testified that she had one friend who visited her once or twice a month, and with whom she spoke by phone approximately once a week for about five minutes. She had regular contact with her mother and nephew, and her grandmother visited about twice a week.  She did not belong to any club, organization, or church.  Id. at 313-14.

Plaintiff stated that she did not need help with daily activities like getting dressed, but that sometimes her mother laid out clothes for her and her baby.  Plaintiff did not get dressed or take care of her personal hygiene everyday, and did not do things the way she "would like to," due to being tired.  Her mother dropped off Plaintiff's child at daycare (paid for by the State) at 8:00 a.m., and picked up the child at 5:30 p.m.  Plaintiff and her mother cared for the child in the evenings.  Plaintiff fed her child; her mother did the cooking.  Plaintiff stated that she put her child to sleep, with her child sleeping with her in her bed, and that she changed the child's diapers along with her mother.   The ALJ asked, "So you kind of take care of your child?" and Plaintiff responded, "Yeah."  Id. at 314-16.

Plaintiff testified that her mother did the grocery shopping.  Plaintiff did not go along: "I don't like it.  I'll get a headache."  Plaintiff testified to leaving the house once a week, for example to visit the state welfare office.  When at home, she would lay in bed and sleep during the day, and watch T.V. when her child could lie with her.  She washed dishes, but got "tired of standing at the sink."  She stated that she had no physical problems like asthma that would keep her from working.  Id. at 317-18.  Plaintiff

submitted a list of medications that she was currently taking: Effexor, Depakote (for mood swings), Clonazepam (for panic), Trazodone (for depression), Imitrex (for migraines), and Ventolin (for breathing). Id. at 90.

**ALJ's Decision of July 19, 2006**

The ALJ found that Plaintiff's mental impairments may have been "severe" under the Commissioner's regulations, but that they did not equal the criteria of any deemed-disabling impairment listed in the regulations. The ALJ stated that the evidence showed that Plaintiff suffered from bouts of depression, but that the record failed to establish depression of a disabling severity for a duration of at least 12 continuous months. Id. at 12.

The ALJ then summarized the medical record and stated that he considered the factors for evaluating the credibility of a claimant's testimony, as set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). He found Plaintiff's allegations that her mental impairments precluded all substantial gainful activity not credible. The ALJ stated that absence from the record of a treating physician's opinion of disability detracted from Plaintiff's subjective complaints. The ALJ noted that although Dr. Kabir reported that Plaintiff had some marked limitations, Dr. Kabir wrote that he could not assess the duration or the severity of these limitations due to Plaintiff's noncompliance with treatment. The ALJ stated that failure to follow a prescribed treatment without good cause was a basis for denying an application for benefits. The ALJ concluded that no good cause had been shown by Plaintiff for being noncompliant with treatment. The ALJ also

stated that Plaintiff had also been noncompliant with counseling, appearing for one counseling session (immediately following her April 2005 hospitalization) and not returning.  Id. at 12-15.

The ALJ found that Plaintiff was not fully credible.  He stated that she "left work on her own volition," reporting on her application for disability benefits a desire to stay home to breast-feed her newborn.  The ALJ referred to precedent considering it significant when claimants leave work for reasons other than their medical condition.  The ALJ found that the medical evidence did not support Plaintiff's testimony.  Noting Plaintiff's receipt of food stamps and daycare assistance from the State, the ALJ stated that "[a] clear pattern of benefit seeking behavior is present," and that an ALJ could discount a disability claimant's complaints "if, for among other reasons, a claimant appears motivated to qualify for disability benefits."  The ALJ found that "[a]t best" Plaintiff's depression was of disabling severity from February 2005 (her alleged onset date) to June 2005, and thus failed to meet the 12-month duration requirement for establishing a disability.  Id. at 15.

The ALJ then concluded that Plaintiff was able to perform "a wide range of work at least at the sedentary exertional level with a limitation to simple tasks," and that based on her vocational factors (age, education, and work experience), application of the Guidelines (Table 1, Rule 201.25: applicable to individuals age 18-44 with less than a high school education and non-transferable skills from skilled or semi-skilled previous work experience) directed a conclusion of not disabled.  Id. at 15.  In his summary of findings,

the ALJ included as a finding that Plaintiff had "the [RFC] to perform substantially all of the full range of sedentary work." Id. at 16.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [the court must] also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as a condition of which significantly limits a claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, the disability claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1. In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If the claimant is able to perform her past relevant work, she is not disabled. If she cannot perform her past relevant work, step five asks whether the claimant has the RFC to perform other work in the national economy in view of her vocational factors, i.e., age, education, and work experience. If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R.

§§ 404.1520(a)-(g); <u>Fastner v. Barnhart</u>, 324 F.3d 981, 983-84 (8th Cir. 2003); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).

At step five, the burden is upon the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with her vocational factors. <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998). Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines due to nonexertional impairments, such as pain or depression, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE. <u>Id.</u>

Here, the ALJ concluded at step three that Plaintiff did not have an impairment that met or equaled a listed impairment. The ALJ then concluded at step four that Plaintiff was unable to perform her past relevant work. At step five the ALJ concluded, based upon the Guidelines, that Plaintiff was capable of performing other work in the economy and was, thus, not disabled.

**<u>Assessment of Plaintiff's RFC / Reliance on the Guidelines without Obtaining Testimony from a VE</u>**

Plaintiff argues that the ALJ's RFC determination limiting Plaintiff's capacity to simple tasks is not supported by substantial evidence, because medical opinions in the record suggested additional limiting factors apart from the complexity of tasks. A disability claimant's RFC reflects what she can still do despite her limitations. 20 C.F.R.

§ 404.1545(a). The "'most important issue'" in a disability determination is whether the claimant has the RFC "'to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (quoting Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998)). The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, "[t]he ALJ bears the primary responsibility for determining a claimant's" RFC. Krogmeier, 294 F.3d at 1022, 1024. An RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC]." Id. at 1022 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)).

Here, the Court concludes that the record does not support the ALJ's conclusion that the only work-related restriction on Plaintiff's abilities was that she was limited to simple tasks. The ALJ's conclusion appears to be based upon Dr. Lane's October 21, 2005 Psychiatric Review and Mental RFC Assessment described above.[13] While it is true

_____

[13] Plaintiff complains that the ALJ relied on the unsigned report of a non-examining consultant appearing at page 94 of the administrative transcript. However, the

24

that Dr. Lane opined that there was no objective, credible evidence that Plaintiff could not complete at least simple repetitive work, the ALJ's RFC assessment did not include Dr. Lane's opinion in the same report that Plaintiff should avoid work that involves significant public contact and/or teamwork and should avoid highly unstructured work. The ALJ did not specifically discount this aspect of Dr. Lane's opinion, nor does the Court discern a basis for doing so.[14]

The Court concludes that the ALJ was entitled to discount Dr. Kabir's more restrictive assessment of Plaintiff's functional abilities, namely, that she had marked limitations in her ability to maintain socially acceptable behavior and to perform at a consistent pace without an unreasonable number or length of rest periods. As the ALJ noted, Dr. Kabir also reported he was not able to assess the duration of these marked limitations due to Plaintiff's noncompliance with her medications, and that this noncompliance had compromised her response to treatment. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (holding that ALJ properly did not give controlling weight to treating physician's opinion that the claimant was disabled where same physician noted the claimant's failure to follow a prescribed course of remedial treatment).

The ALJ did give some valid reasons for discrediting Plaintiff's own testimony with respect to the severity of her symptoms, such as the fact that she wrote on her

---

ALJ does not mention this report in his decision.

[14]   It is also not clear why the ALJ limited Plaintiff to sedentary work, or to "at least" sedentary work, as exertional limitations are not part of this case.

disability form that she stopped working in January 2004 of her own volition, other reasons by the ALJ are less valid, such as his discounting Plaintiff's credibility due to her "benefit seeking behavior," see O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (noting that all disability claimants are financially motivated to some extent), and the fact that no doctor stated that Plaintiff could not work or was disabled, see Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (remanding case in which ALJ considered lack of work restriction as detracting from claimant's treating physician's opinions but had not asked physicians whether impairment might limit claimant's ability to work).

But the essential problem with the ALJ's disposition of this case remains the lack of support for his RFC assessment. If a limitation to simple tasks were the only non-exertional limitation on Plaintiff's RFC, reliance on the Guidelines would have been proper. See Vuxta v. Comm'r of Soc. Sec., 194 Fed. App'x 874, 878 (11th Cir. 2006); Clark v. Massanari, 21 Fed. App'x 596, 598-99 (9th Cir. 2001). The record suggests, however, that Plaintiff may have other non-exertional limitations. If she also could not do work that involved significant public contact or teamwork, or work that was highly unstructured, the testimony of a VE would be required at step five in the disability determination process. See Draper v. Barnhart, 425 F.3d 1127, 1132 (8th Cir. 2005) (stating that generally, where a claimant suffers from nonexertional impairments that limit her ability to perform the full range of work in one of the exertional categories set forth in the Guidelines, "[t]he omission of testimony from a vocational expert . . . leaves us with an undeveloped and inconsistent record, and provides us no alternative but to remand for

26

further proceedings."); <u>Duryee v. Apfel</u>, No. C97-4050-MWB, 1998 WL 34114571, at

*12 (N.D. Iowa Aug. 24, 1998) (noting that limitation to a low stress level job where the

claimant could perform no more than simple, routine tasks with no contact with the

general public and limited contact with co-workers, would preclude the individual from

engaging in the full range of activities contemplated by the Guidelines, thus requiring the

need for the testimony of a VE at step five).  In sum, the Court recommends that this case

be remanded for a fuller evaluation of Plaintiff's RFC and for consideration of the

subsequent need for testimony from a VE.

## CONCLUSION

The ALJ's decision that Plaintiff was not disabled within the meaning of the Social

Security Act is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be

**REVERSED** and that the case be **REMANDED**.

The parties are advised they have eleven (11) days to file written objections to this

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of

time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 15th day of August, 2008.